Coupled with Watts' asseveration of an understanding with Alderdice that the bond should be signed by Winston, is the like asseveration of an understanding that the bond bound him only to the non-removal and forthcoming of the tobacco fixtures to which it refers, and not to the payment of money. This allegation is sustained by evidence scarcely less strong and direct than that in regard to Winston's signature; and yet an inspection of the language of the bond proves that there could have been no such understanding. The condition was to have all the personalty enumerated in schedule "B" forthcoming whenever the court should require him, &c., &c.; "and to pay said purchase money, to wit, $12,000, one fourth cash, the balance in six, twelve and eighteen months, from the date of an order requiring him so to do, or else surrender the personal property aforesaid for sale by the assignee, and in the event it sells for less than the balance due, to make good the deficiency." Watts is shown by the terms of the bond to be clearly mistaken as to any understanding with Alderdice, that the bond given did not bind him to pay money; and the complete form and finished appearance of the bond almost as clearly shows that there could have been no such understanding as he alleges as to the signature of Winston. For reasons stated in writing 30th of April, 1878, when I set aside the verdict of the jury then recently rendered, I cannot bring my mind to credit Watts' testimony or to conclude that this bond is void as to Watts. I do not mean in this declaration to impute bad faith to him or any witnesses who more or less corroborate him in regard to the alleged understanding with Alderdice as to Winston's signature. I have no doubt of his and their sincerity in such testimony as they have given. The strong bias of interest upon a mind long pondering over and much excited upon one subject has doubtless produced genuine convictions of the truth of the things to which he testifies. I think he has confounded what was said when the first bond which Mr. Wise prepared was brought to him for signature, with what was said when this second bond was executed. The testimony of Mr. Putney and Mr. Bondar when given before the jury was very indefinite, inconclusive and unreliable, and the fact of its having become much strengthened by the time their late depositions were taken, may be truly ascribed to their sympathy for a good man threatened with a loss of this sort. I do not think in refusing to accept their evidence as sufficient to overcome the strong, clear, unqualified language of the bond itself which stands before me as a fact which the law presumes to be genuine until absolutely disproved—that I reflect upon their veracity or integrity of purpose. I have taken pains to have the whole case put in writing in order that, if I myself am in error in making an order enforcing this bond, the error may be corrected on appeal. I will sign an order in accordance with the prayer of the petition.

From this decision of the district court appeal was taken to the supervisory jurisdiction of the circuit court, the chief justice of the United States sitting. [The judgment of the district court was affirmed. Case No. 9,353a.]

---

## Case No. 9,353a.

### In re MAYO.

[4 Hughes, 384.]

Circuit Court, E. D. Virginia. June, 1882.[1]

BANKRUPTCY—LIABILITY OF SURETY — SIGNATURE TO BOND—JURISDICTION.

[1. Where a bond is given pursuant to an order made in bankruptcy proceedings, and the order itself is copied into the bond, as presented to the sureties for signature, the sureties are affected with notice of all that is contained in the order, and it is immaterial what the obligee may have told them as to the legal liability created by the bond.]

[2. Where, pursuant to an order made in bankruptcy proceedings, the bankrupt has been allowed to retain possession of certain property on giving a bond with sureties, the court has jurisdiction, in case of a breach of the condition of the bond, to proceed against the sureties summarily by petition in the bankruptcy case; for, by signing the bond, they submitted themselves to the court's jurisdiction.]

[3. The fact that the assignee in bankruptcy, who was the obligee in the bond, first attempted to enforce it by an action at law, and that a verdict was rendered for defendants, which was set aside by the court, and a new trial granted, would not operate to prevent the subsequent proceeding to enforce the bond by petition in the bankruptcy case, for, after the granting of a new trial, the case stood as if no trial had ever been had.]

[Appeal from the district court of the United States for the Eastern district of Virginia.

[In the matter of D. C. Mayo, a bankrupt. The appeal is from an order made by the district court, upon the petition of the assignee. Garnett, enforcing a bond against the bankrupt and his sureties, W. K. Watts and Lawrence Lottier. Case No. 9,353.

[For prior proceedings in this litigation, see Case No. 5,245a.]

WAITE, Circuit Justice. Upon the merits, I am entirely satisfied with the conclusion reached by the district judge. The defense relied on is not established by the evidence. The bond was conditioned as the order of the court required. The assignee had no authority to accept any other. As the order of the court was copied into the bond, the sureties are charged with knowledge of what the assignee was required to get before he delivered the property. It is clear, therefore, that what the assignee may have said as to the legal effect of the obligation to be assumed by the sureties is wholly immaterial. There can be no doubt as to the meaning of the language used to express the obligation. The evidence does not satisfy me that the assignee is chargeable with knowledge of

---

1 [Affirming Case No. 9,353.]

the alleged agreement between Watts and Mayo that the bond was not to be delivered unless signed by Winston. He, undoubtedly, did suppose Winston would become one of the sureties, but there is nothing to show that he understood that Watts was not to be bound unless Winston signed also. The understanding between Mayo and Watts is immaterial unless the assignee knew of it.

I think, also, that the district court had jurisdiction to proceed summarily as in bankruptcy to enforce the bond. The bond was taken by the bankrupt court in course of the administration of the bankrupt's estate. It was in the nature of a receiptor's bond, or a stipulation in admiralty, and took the place of the things which were delivered to Mayo on the acceptance of the security. In this way the sureties voluntarily made themselves parties to the bankruptcy suit, and submitted to the summary process of the bankruptcy court. In bankruptcy the court administers on the estate. The assignee is an officer of the court, charged with certain duties. The court must administer the estate according to law, and its proceedings are subject to examination and review by the circuit court under its supervisory jurisdiction in bankruptcy matters. Every one who contracts with the court in the course of the administration submits himself to the summary process which the law has provided to bring about a prompt settlement of bankrupt estates. Those who contracted with the bankrupt stand in no such position. Everything which depends on what was done before the bankruptcy, or afterwards, not connected with the administration, must be treated as outside of the bankruptcy proceedings, and governed accordingly. But all contracts with the court sitting in bankruptcy are in effect part of the proceedings in the bankruptcy suit. This is in accordance with the ruling of Judge Bond in Rosenbaum v. Garnett [Case No. 12,053], from which I am not disposed to depart. The fact that, after the order of the court requiring the assignee to proceed with the collection of the bond, a suit on the common-law side of the court had been begun, did not prevent proceedings for the same purpose under the summary jurisdiction before judgment actually rendered in the common-law suit. The power of the court to set aside the verdict in that suit, and grant a new trial, because the verdict was against the evidence, cannot be attacked collaterally. The new trial having been granted, the case stands as though no trial had ever been had, unless the order for the new trial is set aside in some appropriate form of proceeding instituted for that purpose.

The sureties were not entitled to special notice of the sale of the property after it was surrendered under the conditions of the bond. It was enough that the property was delivered up by the principal on demand, as he was bound to do, and that sufficient public notice of the sale was given. There is no allegation of fraud. It rested in the discretion of the court whether to submit the issues of fact to a trial by jury, or not. I think the court properly declined to allow a jury trial.

The judgment of the district court is affirmed, and an order may be prepared to that effect.

---

## Case No. 9,354.

### MAYO v. BLAIR et al.

[1 Hayw. & H. 96.][1]

Circuit Court, District of Columbia. Aug. 13, 1842.

LIBEL—PLEADING—NOT GUILTY—JUSTIFICATION—EVIDENCE—DAMAGES—MITIGATION THEREOF.

1. Where a declaration charges a libel, to which the defendants pleaded not guilty, it is incompetent for the defendants to prove the truth of said libel even in mitigation of damages.

2. The defendants having pleaded justification, averring the truth of the libel, they must prove the truth of the alleged libel with the inuendoes as laid in the declaration.

3. It is not competent for the defendants in sustaining the issue on their part on the pleas of justification to give any evidence in mitigation of damages, if the jury shall believe from the evidence that the plea of justification was not made out by proof.

4. In a suit for libel the amount of damages is a matter for the determination of the jury.

[This was an action for libel by Robert Mayo against Francis P. Blair and John C. Rives.]

Richard S. Coxe and Brent & Brent, for plaintiff.

James Hoban and F. S. Key, for defendants.

The declaration is as follows: That whereas, heretofore, to wit, on the 7th of July, 1838, at the county aforesaid, the Hon. John Quincy Adams had stated in the house of representatives of the United States, that he had seen an original letter in the handwriting of Gen. Andrew Jackson, president of the United States, dated the 10th of December, 1830, and addressed to a certain Wm. Fulton, then, to wit, at the date of said letter, secretary of the territory of Arkansas, which letter was then stated by said Adams to be in the city of Washington, where it could be seen by any gentleman who had curiosity to examine it; and whereas the said Adams, at the same time and place, had read to the said house of representatives a paper purporting to be a true copy of said original letter, whereby it was represented that the said Jackson had written a letter marked "strictly confidential" to the said Fulton, advising him in substance that information had been received by said Jackson that an extensive expedition was organized in the United States

[1] [Reported by John A. Hayward, Esq., and George C. Hazleton, Esq.]